Statement of the Case.
MONROE, C. J.
Plaintiff brought this suit for damages said to have been sustained by reason of an alleged assault committed upon him whilst he was engaged, and with the view of obstructing him, in the discharge of his duty as deputy marshal of the town of Dodson, and, by reason of an alleged malicious prosecution, it being further charged that the acts complained of were committed by the defendants, respectively, in pursuance of a conspiracy entered into between them and others, and that the assault was without provocation and the prosecution without probable cause. Defendants answered, denying the charges contained in the petition, as to Luther Stovall, setting up a demand in reconvention based upon an assault alleged to have been committed by plaintiff.
The case was tried by a jury, impaneled at the instance of defendants, which brought in a verdict rejecting both demands, and, judgment having been entered in accordance with the verdict, plaintiff has appealed.
It appears from the evidence that the Stovall family is an influential one in the parish of Winn, conducts the most extensive mercantile business in the town of Dodson, and pays more taxes, it is said, than the other taxpayers combined. During the year 1912 the political faction to which the members of the family belong were in control of the town government, the defendant Lee Stovall having been one of the (three) aldermen, mayor pro tem. and deputy marshal, and their administration appears to have given consid-1 erable dissatisfaction, to their opponents and, perhaps to others, so much so that an extensively signed petition was presented to them, ashing, in effect, that the corporate organization be abandoned for the time being, “to allow the chaotic condition,” then existing, to subside, and that the board adopt a resolution repealing all ordinances previously adopted, annulling all fines and taxes that had been levied and restraining the mayor pro tem. and the town marshal from any further discharge of their functions. Included in that unusual petition, we find the following preamble to the suggested resolution, to wit:
“Therefore, since there has been so much discrimination in collecting licenses from certain persons and excusing others, and since the council neglected or failed to make a budget of expenses or levy a property tax for or during the year 1912, and failed to publish the same in any paper of the town or parish, and since any effort to collect such tax would not be justified by law and would involve the town in an unnecessary litigation and expense, therefore,” .etc.
The petition was probably laid on the table or elsewhere, and the dissatisfied ones proceeded, as we infer, to organize a “law and order league,” and to put in a new administration, and thereupon those who were put out became the dissatisfied ones — members of the opposition — and began and continued to give trouble and to make it so unpleasant for the newly elected officials that just before the occurrence out of which this suit has arisen one of the aldermen resigned, and just afterwards the mayor (who was also a minister of the Gospel) not only resigned, but left the town. It appears that the mayor and board of aldermen elected plaintiff deputy marshal; that upon a Sunday in December, 1913, the new deputy arrested a negro named Roberson (a tenant of and was perhaps employed by Lee Stovall) upon.a pending charge of fighting — the fact being that he had given a beating to another negro, named Aleck Smith; that Roberson admitted his guilt and express- | ed a willingness to pay a fine, if he could get *535 ofl! in that way, and that plaintiff took him around to the residence of the mayor pro tem., to whom also he admitted his guilt and expressed the same willingness; that the mayor pro tem. told him that, not having his books and it being Sunday, he “could not tell him for certain,” but he thought'the fine would be about $5 and costs, which the negro thereupon promised to pay “right away” (i. e., the next day); that the mayor pro tem. saw him several days later and asked him whether he had been over to settle with the mayor, and was told that he had not; that (probably on the following day or day after) according to the testimony of the may- or pro tem. the defendant Luther Stovall called on him, accompanied by the negro, and “seemed to be mad,” used a good many “curse words,” and wanted to know why he (the mayor pro tem.) fined “the negro,” and why the negro didn’t have a trial, and said that he would spend $1,000 rather than that he should pay any fine, to which the mayor pro tem. replied that he had merely told the negro what the fine would be, “inasmuch as others have (had) been paying and coming up and making settlements,” and that if he needed any instructions from defendant he would let him know. Defendant testified that he told the mayor pro tem. to arrest the other negro and give them a fair trial, and that if Roberson were convicted he would see that the fine was paid. He was asked whether he said that he would spend $1,000 rather than see the negro convicted, and he replied that he did not. The negro himself, who was called as a witness for defendants, was able to remember that something was said about $1,000, but was unable to recall “just how he said it.” “If he said it [he continues] — I wouldn’t say, for sure, that he did say it, but, if he said it — he said he would spend $1,000 before I paid it, unless I had a trial.” 1-Ie said that on the day of his arrest he had promised to come back and pay the fine; his answer to the question whether he had, at that time, asked for a trial, being that “the onliest way with me was that I was trying to get out of it.” He said that, after being released on his promise to pay, he went to the Stovalls and was told by them not to pay, without a trial, and that after the interview above referred to the marshal came after him and told him that he would have a trial. He further testified as follows (quoting in part):
On examination in chief:
“Q. Just tell why you didn’t come back and pay that fine. A. Just because I really didn’t have no trial, and I didn’t think old Aleck was worth a fine; I will be honest about it.”
On cross-examination:
“Q. You gave old Aleck a pretty severe whipping? A. No, sir; not so much. Q. You did whip him? A. Yes, sir; but he gave me cause to do it. Q. Aleck is an old man? A. He is older than I is. Q. How much do you weigh? A. About 218 pounds.”
The alderman and mayor pro tem. referred to in the foregoing statement was Mr. H. L. Lewis; the interview mentioned took place some two or three weeks before Christmas, 1913, and during the interval Mr. Lewis resigned and W. C. Anders, another alderman, succeeded him as mayor pro tem. On December 23d plaintiff, in his capacity as deputy marshal, arrested a negro named Ester Lewis, upon a charge, the' hearing of which, before the mayor’s court, was fixed for the following day. An investigation made that night led to the conclusion that the charge could not be sustained, but the negro was notified to appear and answer, at the time appointed, to a charge of cursing and swearing on the public highway, and he so appeared. The defendant Lee Stovall, as also Ben Jackson and M. D. Morgan (the two last named being also among the alleged conspirators, though not here made defendants) were present and interested themselves in the negro’s behalf, though it does not appear that they asked for a continuance. The *537 trial resulted in a conviction and a fine of $5 and costs, and it is said that an appeal was applied for and allowed, but no one offered to give bond, or to pay the fine. W. C. Anders, at that time mayor pro tern, (though not so acting, as the mayor himself presided), was asked whether anything was said about taking an appeal, and his reply was:
“I don’t know that Lee said anything in particular. M. D. Morgan and Ben Jackson said that they were going to see that the darky got justice. Lee was there trying to bully around, trying to run over the court.”
There is some other testimony to the effect that Jackson asked for an appeal, and other testimony to the effect that it was said that they had three days within which to take the appeal. It is not pretended that an appeal was asked for and denied. After the sentence was pronounced, the question arose as to the disposition that should be made of the prisoner, as there was no place provided in Dodson for his incarceration. The mayor therefore placed him in charge of the plaintiff, and went out to telephone to the sheriff about his being taken to Winnfield, to be there lodged in the parish jail, and some time later (say 15 or 20 minutes) the defendant Luther Stovall came into the room (being a room in the rear of that in which the mayor had held his court), and a fight ensued between him and plaintiff, which lasted for some minutes, during which the prisoner disappeared, without paying his fine or giving bond, and did not reappear until called as a witness for defendants on the trial of this case.
Plaintiff’s version of the occurrences, beginning with and succeeding the entrance of Luther Stovall into the room, is as follows:
“He [Stovall] walked into the little back room, where the negro and I were, waiting for the return of the mayor, and said to the negro, ‘What aje you doing here, old negro?’ and seized the negro by the arm and said, ‘Come on here.’ * * * I seized the negro by the other arm. .Q. What was done then? A. Luther hit me in the face with his fist. Q. What took place then ? A. A general fight took place.”
That version is corroborated by the testimony of John Elliott, one of the aldermen, who was the only person in the room beside plaintiff and the negro when Luther Stovall entered; and by Tom Dean, who is referred to as a boy, but who, from his testimony, appears to be a mature and intelligent boy, if boy he is, and to have followed Stovall and his friends to the town hall, and to have reached the front door, where he found his further progress blocked by Lee Stovall, who was standing there with a chair in his hands, and the evident intention of preventing others from interfering with the progress of the affair inside. The negro, however, is shown to have been standing in the door leading from the front to the back room, and, though Dean was unable to see plaintiff, he could see and hear both Stovall and the negro, and he testifies as follows to what he saw and heard, to wit:
“Q. Who was in that room at the time [referring to the front room]? A. Lee Stovall, Mike Gaar, Luther Stovall, Ben Jackson, and Morgan. Q. How long after Luther went in there before the racket commenced? A. Right away. Q. Did you hear them say anything when they went in there? A. No, sir; he went in and took hold of the negro and said, ‘Come on here and go with me.’ Q. Who took hold of the negro? A. Luther. Q. When? A. Just as soon as he got in there. He first asked the negro what he was doing there. * * * Q. What did the negro say? A. He said that they had him under arrest, or had him there. Luther caught him by the arm and said, ‘Come on and go with me.’ Q. What was done after that? A. Some one caught him on the other side. There was a partition in the room and Bill Terral was on one side and Luther was on the other. Q. After the other man took hold of the negro, what did Luther do? A. There was a lick passed. Q. Who passed it? A. Luther, Q. Did he hit the man that had hold of the negro? A. Tes, sir. Q. What was done then? A. They had the fight then. Q. What became of the negro? A. I don’t know; the negro left there, running. Q. Now, during this time, where was Lee standing? A. There by the door; Jules Waters came up and went in.”
Save as to the parties who were iu the front room, the testimony of the boy is cor *539 roborative, in every particular, of that given by Elliott, who, as we have stated, was inside of the back room. Elliott testifies that he saw Jackson and Lee Stovall, and may very well have missed seeing Gaar and Morgan. There is no doubt that Luther Stovall, Jackson, and Lee Stovall entered the front room in the order named, that Jackson followed Luther to the door of the hack room, and that Lee took his stand, with the chair, at the door of the front room, and there is testimony to the effect that he stated, in substance that there was a fair fight going on within, and that no one was to interfere. He himself at one time went into the back room and removed Luther’s glasses from his face, but he made no attempt to separate the combatants. Jules Waters testifies that, being near the drug store (to which we will again refer), he was called by Terral’s uncle to come and help stop the fighting, and that, answering the call, he found Lee at the front door, with a chair in front of him, and his hands on the chair, that Lee said that it was nothing but a little fight, and that it was being done fair, and that he replied that he would like to see it, and “shoved him out of the way and went in.” He was asked if he saw Tom Dean, and he replied that he did not, but he was also asked if he saw Elliott, and he gave 'the same reply, though Elliott’s presence is undisputed.
There is some attempt on the part of defendants to show that Dean was down at Jones’ store when the fight began, and hence could not have been at the city hall. But Jones’ store is opposite the drug store, and it was at the drug store and between there and the city hall that defendant and his friends discussed the question of taking the negro, and it would be a strange boy who could not scent a fight under such circumstances, and (although, in this instance, said to be somewhat disabled) who would not make his arrangements to be promptly on the spot. Upon the whole, we think the boy’s testimony is about as reliable as any that we find in the record, and much more so than a great deal of it. Plaintiff’s version of the affair is further corroborated by the testimony of several witnesses as to what was said by Luther Stovall and his friends just before they went' to the city hall. And just here we shall endeavor to establish the relative positions of the different places mentioned in the testimony.
The city hall fronts to the south, on a street which runs east and west, and is about 70 feet from Jones’ store, which stands upon the corner of the same block, to the westward ; the drug store, which is owned by the Stovalls, and, in the management of which the two defendants are active participants, stands on the opposite corner, to the south, and the barber shop stands upon the opposite corner of the intersecting street, to the westward of Jones’ store.
A. B. Anders testifies that he has known the litigants all their lives; that his wife is plaintiff’s aunt; that he passed by the may- or’s office while the trial of the negro was in progress, and went to the drug store and the barber shop; that he subsequently learned that the trial was over by seeing the people coming from the mayor’s office; that he had gone to the post office, and in passing between the mayor’s office and Jones’ store met Jackson and Morgan, who said that they were going “up there and take that prisoner,” and that he “was pulling them back and begging them not to do that” ; that he then met Luther Stovall, who walked up and said, “Men, if you haven’t got melt enough to take that damn negro, I have,” and that he caught Luther by the sleeve and pulled him back, and that just then some one called from the drug store and the three men answered the call, and he went to the barber shop.
A. J. Williams had lived 18 or 19 years near Dodson, and knew the litigants, but was *541 not related to them; was at the city hall during the trial and left there with the crowd when the trial was over and strolled around; was standing right close up to Lee Stovall and Morgan and Jackson (he thought it was Jackson, though he was not quite sure) and several others, and heard them say something about going up there and getting that negro .out; “Luther came out of the drug store and said, ‘Let’s go up there and get that negro out.’ They all walked off up that way, and the crowd walked on behind him.” “I was right behind the crowd.” On his cross-examination (by counsel for defendants) he testified as follows:
“Q. Isn’t it a fact that what you heard Luther Stovall say was, ‘Come on and let’s go up there and get that negro out?’ A. Yes, sir. Q. When counsel was asking you about that, Mr. Hawthorn put the answer in your mouth, and which goes down on the record, that you said that they would go up there and take that negro. A. He said ‘Go up there and get him and take him’ — I don’t know just what he said —he said go up there and get the negro out or take him. ’* * * Q. He didn’t say get him out on bond, or how? A. No; I don’t know how he meant to get him out.”
Tom Mooney (not shown to be related to either of the litigants) testifies that he was at the drug store after the trial of the negro and just before the fight, and that among those whom he saw there were Jules Waters, Will Preston, Harvey Waters, Mr. “Shep” Terral, Bood Milan, Luther Stovall, Lee Stovall, M. D. Morgan, and Ben Jackson; that he heard Luther Stovall say to M. D. Morgan, “M. D., if you want the negro, we will go and get him;” that he did not see the party leave the drug store,' but that the next that he saw was Mr. Lee Stovall, standing in the mayor’s court with his hands on the back of a chair. “Q. Was he standing in the door? A. Yes, sir; two or three started in, and he said, ‘Stand back; don’t come in here; two boys have taken it on themselves to have a fight.’ ”
J. R. Terral, an uncle of the plaintiff, testifies that he heard a conversation in which Luther Stovall said that he could take the negro away from him (W. S. Terral) and whip him too. He also testifies to a conversation between himself and Lee Stovall, some week or ten days prior to the occurrence here in question, in which Stovall spoke of the acceptance by W. S. Terral of the position of deputy marshal and assured the witness that his nephew would have trouble.
J. T. Long, district attorney, testified that he traveled on the train with Lee Stovall to Ruston, and that Stovall said to him, in effect, that he was not going to pay his street taxes, and did not intend to be arrested by Bill Terral; that his manner was such as to convey the impression that he did not propose to recognize Terral as an officer to collect anything; so much so, that witness advised him that he had better not resist Terral.
There is other testimony to the effect that, after the negro was released, or escaped, the friends of the Stovalls were quite noisy in their celebration, indulged in considerable profanity, and referred contemptuously to the law and order league, and that Lee Stovall met the mayor on the street and, without provocation, called him a “black sheep,” and gave him to understand that he would “clean his plow,” which, as we take it, was not intended as a courtesy, or an offer of service, though its exact significance is not altogether apparent."
It was shown that plaintiff had had three difficulties, 12 or 13, 8 or 10, and 5 or 6 years, respectively, prior to the date of the trial, and the marshal testified that he would not have consented to his appointment, if he had been consulted, that he was “too high tempered, too fractious,” and that he had had several little scraps. On the other hand, there are several witnesses who testify that the marshal was present at the meeting of the mayor and board of aldermen when plaintiff was appointed deputy, and that he gave *543 Ms categorical assent to the appointment. It is shown that plaintiff’s ordinary weight is 140 to 150 pounds, but that he was weighing about 125 pounds at the time of Ms “scrap with defendant, and that defendant weighs from 160 to 170 pounds; that he played football at the University and as a member of the All-Star football team — four years in all —in the position of center, at 137 pounds; also that he left the University to be married in 1909, and that he was 28 years old when this case was tried.
It further appears that, after the occurrences of December 24th, plaintiff brought charges against defendants of resisting an officer and assault and battery, and that on December 26, 1913, he rearrested the negro, Roberson, and collected from him the sum of $7, of which $5 represented the fine that Roberson had promised to pay, and were turned over to the town treasurer on December 27th, and $2 represented the costs and were retained by plaintiff ($1 for himself and $1 for the mayor); and that, because of the collection so made, the defendant Lee Stovall, on December 29th, made an affidavit charging that plaintiff “did then and there assault Charley Roberson with a dangerous weapon, to wit, a pistol, and threaten the said Roberson and obtain $7, in money, of the person of Charley Roberson.”
1-Ie also filed affidavits charging John Terral, W. C. Anders, and L. B. Terral with the same offense; an affidavit, predicated upon the affair of December 24th, charging plaintiff with assault and battery on the person of Luther Stovall; an affidavit charging Barron Lantrip (a son of the mayor) with cursing and swearing and using obscene language on the public highway, on August 20, 1913, and an affidavit charging Edmond Talbot (a supporter of the administration) with assault and battery, committed on Henry Stovall on February 14, 1913. The affidavits last mentioned were offered to show malice in the making of that first mentioned, upon which this suit is, in part, predicated, and the further facts in connection with which are as follows:
It will be remembered that Roberson, acting under the advice of the Stovalls, failed to pay the amount of the fine which, at his request, he was informed by Mr. Lewis, the mayor pro tern., would probably be imposed upon him for beating “old Aleck Smith”; hence when plaintiff next met him he rearrested Mm, and plaintiff appears to have consulted with the persons named in the other affidavits and against whom, and himself, the defendant Lee Stovall thereafter brought the charge of assault with a dangerous weapon and robbery. It is shown that plaintiff and his father, John Terral, had some conversation with the negro, that John Terral went off in search of the mayor, in order to find out whether he would authorize the acceptance of the fine, and that, meeting his brother, L. B. Terral, he asked Mm to go and stay with the parties until his return. L. B. Terral tells of his further connection with the matter as follows:
“When I walked around there, not knowing what negro they had, and when I got up there, I knew the negro and I told him, ‘Howdy.’ I didn’t say anything, but I heard W. S. Terral talking to him and asking him why he didn’t do the way that he had promised, and as he had promised. I didn’t know if they had made a new arrest — and the negro said, because Mr. Lee Stovall and Mr. Luther Stovall wouldn’t let him. He said, ‘Charley you said you was guilty.’ And he said, ‘Yes, sir; I am guilty, and I wish you would take the $7 and let me loose.’ And W. S. Terral said, T don’t know whether I have the right to receive this money, unless Mr. Lantrip was here.’ The negro kept insisting on taking it, and Dock Cole [another negro] was out there, and Charley asked him to loan him the money until he could walk down home and get it, and he paid it to W. S. Terral, and Mr. Terral said to him, ‘The next time, Charley, you promise me anything you had better do it.’ And when he stepped off I just spoke-to W. S. Terral and said, ‘He didn’t answer you.’ And he turned back and laughed, and said, ‘I will do it,’ and that was all that was said.”
W. C. Anders, who was then mayor pro tern., says:
*545 “I came walking out of Mr. Miller’s store and went towards the post office and I saw W. S. Terral and the negro standing south of the post office. Mr. Terral called me and said, ‘Step here a minute.’ And I walked close up, and he said, ‘Charley Roherson wants to pay his fine; can’t you receive it, or do you know whether it is more than Mr. Lewis put on him or not?’ 1 says, ‘No, if Brother Lantrip isn’t here, I can’t.’ And he says, ‘Pa has gone down there to see if he can find him.’ * * * And I says, ‘I will walk down there and see if I can find him.’ And Charley spoke and says, T want to pay this fine; I would have paid it long ago if it hadn’t been for Mr. Lee and Mr. Luther Stovall; they wouldn’t let me.’ And I says, ‘All right, Charley, we’ll see if we can’t arrange it for you to pay it.’ And I walked down to Mr. Mann’s, and Brother Lantrip wasn’t there, and I met Mr. John Terral, and we walked on back part of the way together — I don’t believe he went on; anyway, I went on around there, and Bill and the darky wasn’t there when I got back. Bill had walked around in front of the post office, and he said Charley has borrowed the money from Dock Cole, and has paid his fine, and he has gone after it. [Meaning that he had gone to his house to get the money to repay what he had borrowed.] He says, ‘They went down the railroad yonder.’ ”
It appears that the negro had worked for John Terral for several years, and that the latter had a kind feeling for him, and that he was talking to him when W. S. Terral joined them. He testifies to what W. S. Terral said to the negro, and, further, as follows:
“ ‘Pete [one of his names], why didn’t you come up, according to promise, and pay like you said you would? I turned you loose on your honor, and now you will have to pay more’— something like that. I don’t remember point blank. * * * I spoke up and said — we were talking about sending the negro, by Ed. Scarborough, to Winnfield — and I says, ‘No. I am going to see the mayor and get a light fine on Pete and not send him off to Winnfield.’ The negro told me that he had sent Mr. Lantrip word he wanted to pay his fine, and I says, ‘If you want to pay your fine, I will go and hunt for him.’ ”
He says that there were no threats of any kind and no weapon exhibited, and that he acted from a friendly feeling for the negro, who had worked for him, and with a view to getting him off with the least expense. Being asked, on his cross-examination, why he had sent his brother to stay with W. S. Terral and the negro, while he looked for the mayor, he said that it was because the Stovalls had taken a negro away from Mr. W. S. Terral, only a day or two before, and he wanted witnesses to be present, if that should happen again. He was asked whether he had said anything “about the Stovalls protecting one negro, and that he was dead and in hell now,”'and he replied that he did not say that, but that he did say:
“You whipped that negro there, and you had a fine to pay. Don’t you know that you can’t let them [referring to the Stovalls] conceal you around there and give you any more trouble? You will go the way that negro went when he thought they would protect him, and he got killed.”
Luther Stovall gives his reasons' for going to the city hall upon the occasion in question, and narrates the circumstances connected with his visit substantially as follows:
He left his residence, where he had been spending much of his time with a sick child, in order to have a prescription filled at the drug store, and, in order to perform some function in connection with a raffle at the barber shop, and, having left the prescription to be filled, crossed over to the barber shop and learned that the raffle had already taken place. While at the shop, he looked up the street and saw a few people standing about the city hall, and he asked the barber what it meant, to which the reply was that there was a negro under arrest there who could not pay his fine. Defendant did not know and did not ask what negro it was, nor does it appear that he inquired as to the charge against him, or as to the amount of the fine, but he concluded, nevertheless, that he would go to the city hall, pay the fine, take the negro to his house, and let him there work out the debt by keeping up the fires. He accordingly went back to the drug store, got his prescription, and went to the city hall, and he says that, in so doing, he saw neither his brother, Lee, nor Mike Gaar, nor Morgan. He overtook Jackson on the walk between the drug store and *547 Jones’ store, and tliey walked on to Jones’ corner, where Jackson stopped to speak to Tom Dean and some other boys while he walked on. He proceeded to the hall and to the room where the negro was with no other information concerning the negro than that obtained from the barber, and no other intention concerning him than that which has been stated. Ilis testimony as to what then occurred reads, in part, as follows:
“I walked in the little city hall and they had the negro in the hack room. John Elliott and Bill Terral were both there. I started back there, and the negro was leaning up in the door, and I walked up and said, ‘Hello, old negro; what are you doing here?’ And no quicker than I said that than Bill Terral how into me and hit me. Q. Where did he hit you? A. He hit me on the lip. Q. Up to that time, had you said or done anything to indicate, or did you intend to interfere with the custody of that negro or release him from custody, in any shape, manner, or form, except by paying his fine? A. I had nothing whatever in mind except to pay his fine. If anybody had told me there would be a difficulty, I would not have believed it. Q. You had no conversation with these boys [referring to defendants’ alleged coconspiratorsl and knew nothing of what had taken placo? A. Nothing except what they told me in the barber shop. Q. Now Mr. Terral has testified, and there have been one or two other witnesses who have testified, that, when you went into that back room, you spoke to that negro and said, ‘What are you doing here old negro?’- and that he answered you that they had him, and that you then caught him by the arm and said, ‘Come on and get out of here;’ and that Mr. Terral caught him by the other arm and said that you could not take him away from him; is that true or untrue ? A. That is all a lie. * * * Q. Until he [Terral] hit you, did you put your hand on that negro? A. No, sir. Q. Did you touch him, or catch him on the arm, or make any other demonstration that you intended to release him from custody? A. No, sir.”
Ben Jackson testifies that M. D. Morgan is his brother-in-law, and that the negro Lewis was in Morgan’s employ; that on the evening of December 23d he had a conversation with Mayor Lantrip and the deputy marshal concerning a charge that had been made against Lewis of breaking open a negro woman’s trunk, and that the three went to the woman’s house to investigate the matter; that they found that the trunk had no lid, and came to the conclusion that the charge was not well founded; but the mayor suggested that the negro be held upon “the other charge” — i. e., of cursing and swearing on the public highway, and asked witness whether he would sign the negro’s bond; that witness declined to do so, and the negro then produced $5 and a suitcase, which were accepted in lieu of the bond, and he was notified to appear and answer the charge the next day.
By defendants’ counsel:
“Q. The darky never got his $5 hack? A. I never did see it, hut the darky told me they gave it back. Q. They fined him just enough to get that $5 back? A. Yes, sir; they fined him $3 and $2, and then got it back. Q. They just sized his pile? A. Yes, sir; it looked like it to me.”
The witness further testified that he attended the trial on the following day, and when it was over went to the drug store; that no one was with him; that (quoting):
“Luther came out of the drug store and asked me if I was going up that way, and we went on up the walk together to the corner, and I saw Tom Dean sitting near the west end of Jones’ store, and I stopped to speak to him, and Luther went on up towards the hall. Q. I want to know if you and Mr. Morgan and Lee and Luther Stovall had any conversation about this trial, and if anything was said about taking this negro away from Bill Terral on that occasion? A. No, sir; .1 considered it a joke; I didn’t think about it. Q. Did you see these two Stovall boys and Mr. Morgan bunched up together? A. No, sir. Q. Did you see Luther Stovall when lie went up there? A. After I spoke to this hoy, Luther kept going on, and I went up behind him, and when I got to the door Luther had stopped at the negro. I stopped at the doorsill, and I saw Mr. Terral strike him, and then they got to fighting. Q. Did you see Mr., Terral strike him? A. Yes, sir. Q. Had Mr. Stovall said anything to Mr. Terral to cause him to strike him? A. No, sir. Q. Had he attempted to pull the negro away from him? A. No, sir; not at that time. Q. Where was Lee Stovall, Mike Gaar, and M. D. Morgan when Luther, went into the building? A. I don’t know.”
On his cross-examination the witness said that he and Luther had no conversation about the negro as they walked together; that he did not see Lee Stovall at the city *549 hall; that he thought the person who took Luther’s glasses off was “Logan.” Referring to testimony which he had given on the trial of the Stovalls for resisting an officer, etc., he said:
“I stated that I was ten feet behind Luther Stovall up the plank walk, and that I got to the steps just as he got to the back end of the front room.”
He admitted that he told the district attorney, and also told some friends of his that he knew nothing about the affair, and says that he did so because he wanted to have nothing to do with it, and because his friends “were teasing him” about it. He admitted also that he was convicted of creating a disturbance on the street, after the release of the negro, but says that he was not guilty.
Ester Lewis (the negro) gives the following, with other, testimony:
“Q. Now, Lewis, did you see Luther Stovall when he came into that room where you and Mr. Elliott and Bill Terral were? A. íes, sir; when he walked in, I looked around. Q. Did you see the fight start between him and W. S-. Terral? A. íes, sir. Q. Which one of them-hit first? A. Mr. Terral hit him. Q. What, if anything, did Mr. Luther say to Mr. Terral before Mr. Terral struck him? A. He didn’t say anything to him. Q. Who was he talking to when Mr. Terral hit him? A. He walked up to me and said, ‘Hello, old negro, what are you doing here?’ and Mr. Terral hauled away and hit him. * * * Q. Did Mr. Stovall slap you on the shoulder? A. Yes, sir; he just tapped me on the shoulder. * * * Q. Did Mr. Luther look like he was excited? A. I don’t know; he just walked in and tapped me on the shoulder, and said, ‘Hello, old negro, what are you doing in here?’ ”
Lee Stovall denies that he conspired with his brother, Luther, or with any one else, as charged in the petition; denies that he had any previous conversation with Luther or anyone else concerning the affair, at the city hall, of December 24th; denies that he had any previous knowledge of Luther’s intention to go to the city hall on that day; and denies that he went with him. He testifies that he was at) Jones’ corner, alone, when his attention was attracted by the “racket” at the city hall, and that he went there to find out what it was about; that, when he arrived, he saw Luther standing against the door and Bill Terral with his hands in his collar; that he reached over and got Luther’s glasses off his nose, and did nothing more; that he kept no one from interfering, or from entering the building; that when Jules Waters came he was standing inside the door with his hands on the back of a chair, and (quoting his language):
“I just kinder stopped him — I didn’t stop him either — but I called to him, and I believe he says, ‘What’s the matter?’ and I told him that they were fighting in there, and I just said to him, ‘You are not going to get into it, are you?’ and he says, ‘No.’ ”
He further testifies that Charley Roberson told him of his re-arrest, and of the payment of the fine on the day that it happened (December 26th), and he was asked, “Who told you before he did; anybody?” to which he replied, “I believe Luther walked along by me and said that they had collected some money off Charley Roberson;” but that Luther had no knowledge of the making of the affidavits by him; that he does not remember whether it was the next day, after receiving the information, that he went to Monroe and Ruston, and obtained legal advice, but it was within the next few days; that both Mr. Warren, district attorney of the Lincoln district, and Mr. Bernstein (his present counsel) advised him that collecting money from a person, under the circumstances that were detailed by him, by either an officer of the law or one acting as an officer, was a violation of the law.
Charley Bratt, the barber, corroborated Luther Stovall in the matter of the conversation between them to which Stovall testified.
In rebuttal, Mr. J. T. Long, district attorney for the Fifth judicial district, testified that he was present at the .interview between Lee Stovall and Mr. Warren, and that he and *551 Mr. Warren agreed that the facts as stated by Mr. Stovall disclosed no offense against the laws of the state, and so informed Mr. Stovall. Mr. Bernstein did not take the stand. Mr. Jordan testified that he was the owner of the article that was raffled at the barber shop, and was there when Luther Stovall came in; that there was no one else (than the barber) in the shop at that time, or during Stovall’s stay (which was but a few minutes); that he heard the entire conversation between Stovall and the barber, and that it did not include that to which they have testified.
Opinion.
[1] It seems clear enough that the occurrences out of which this suit has arisen have their origin in a bitter feeling, engendered by a struggle for the control of the affairs of the town, that neither of the parties to that struggle is able to recognize anything good in the other, and that each is ready to take advantage of the slightest error committed by the other, to give trouble, but there is a limit to what may lawfully be done in that line, and we are of opinion that it has been exceeded by the defendants, though the necessity of reaching and expressing that opinion is about as unpleasant as any that we have to discharge, since it obliges us to determine, as between sworn statements, in irreconcilable conflict, which of them should be accepted as the basis of a judgment. The conclusion at which we have arrived is predicated upon a careful consideration of the case as a whole, and of the general atmosphere of over-strained feeling in which the respective parties lived and judged each other.
The Stovall party, while in Control of the town affairs, were much complained of, and various suits were instituted, which vexed and annoyed them. We express no opinion as to the merits off those controversies. They were superseded by their opponents, organized, as we infer, under the name of the “law and order league,” and they, in turn, brought suits which prevented their successors, for some time, from assuming the functions of the offices to which they were elected.
[2] The mayor, who appears to have headed the opposition ticket, and perhaps for that reason alone, seems to have been especially objectionable, ahd the selection by the town council of “Bill Terral” as deputy marshal was particularly resented. When, therefore, the negro Roberson, a burly individual, who was a tenant, and at times employé, of defendant Lee Stovall, was arrested, and, having admitted that he had beaten another negro, whom he called “old Aleck,” was given to understand that his fine, upon conviction, would amount to $5, with $2 costs, and that he could escape imprisonment, in default of a bond, or the necessity of giving bond, and the inconvenience of a trial, by paying the same, and was released upon his assurance that he would pay it the next day, the leniency thus somewhat irregularly extended to him seems to have been regarded as an unheard-of outrage, and was the occasion of a visit by one of the defendants to the mayor pro tern., and of 'the expression, in strong terms, of his indignation. And the accused negro, upon the advice of defendants, forfeited his promise, and remained at large, without giving, or offering to give, bond for his appearance. And again, when the negro Lewis, an employé of one of the Stovall party, was charged with breaking open a' trunk, and probably larceny, the mayor and the deputy marshal put themselves to the trouble of making an investigation, which appears to have satisfied them that the charge could not be sustained, and they informed the negro and the brother-in-law of his employer that it would not be insisted on, but that he must answer on the following day to the charge of cursing and swearing on the public highway. There is not a syllable in the *553 transcript (of over 400 pages) to indicate that any further delay was asked or desired, and nothing, save the statement of Jackson that he regarded the trial as a “joke,” to indicate that the negro was not properly convicted. His employer, Morgan, the defendant Lee Stovall, and Morgan’s brother-in-law, Jackson, were present, with many others, at the trial, which appears to have been the attraction of the day. If the three gentlemen mentioned were as much interested in the event as they appeared to be, they might have secured a lawyer, and, after the conviction, they might have offered a bond for the negro’s release and taken an appeal in his behalf. But their feelings seemed to have found expression mainly in loud talking, in the crowd, by reason of which one or two arrests were made.
The defendant Luther Stovall tells Lee' that, coming to the barber shop, after having left his prescription to-be filled at the drug store, he had learned nothing of the trial, and heard of it only when told by the barber that there had been a trial, and that there was a negro at the mayor’s office who was unable to pay his fine, and, with that information, he concluded, without knowing the negro or the charge against him, that he would go to the city hall, pay the fine, and take the negro to his home as a builder of fires. The evidence shows, abundantly, that the drug store was one of the centers about which the floating population, which had attended the trial,- was revolving, and that Lee and Luther Stovall were part owners (or sole owners, for aught we know) and managers of it, and it is difficult to understand how Luther Stovall could possibly have gone in, with his prescription, and, coming out, have crossed over to the barber shop, and then have gone back to the drug store, and walked from there to the city hall, without meeting some one who would have told him of what had taken place. It seems strange, too, that Jackson, who had been interesting himself in the negro’s behalf, during the trial, should have remained absolutely dumb concerning it, and upon every other subject, as he and Stovall walked together, on the way to the hall. He knew, if Stovall did not, who the negro was, and he was full of the subject, but, if he had forgotten about the trial, one would suppose that when he understood that Stovall was on his way to the scene, where the negro had been left in the custody of the deputy marshal, it would have awakened some faint recollection of the “joke,” as he called it, and that the association of ideas would have led him to ask Stovall why he was going there; and that he would have asked himself the same question. Stovall had asked him if he was going that way, and he had joined him, but then he stopped to speak to Dean, and he never rejoined Stovall, so that, as he was no longer going in order to accompany that gentleman, his going at all would seem to need some explanation. The story, as thus told, bears an air of improbability of which we are bound to take notice because of its relation to the direct testimony, just as we have felt bound to take notice of the state of feeling in the town and of the action of the defendants in the matter of the negro Roberson. And, then, we have the two accounts of the beginning of the fight. There was a deputy marshal in the mayor’s office, holding a negro prisoner, by direction of the mayor, until it could be determined what disposition should be made of him, and defendant says in his testimony that he knew that a negro was being so held, though who he was and by whom held he did not learn until he reached the office. He further testifies that his only purpose was to pay the fine that had been imposed upon the negro, and thus secure his release, but that the negro being nearer to him than the deputy, when he entered the door, he said to him, “Hello, old negro, what are *555 you doing here?” whereupon the deputy immediately flew upon him and struck him in the face — which also seems improbable. n.nd there is, too, as we should judge, an inaccuracy in the statement, which defendant’s counsel have unintentionally emphasized. Defendant was asked, particularly, whether he took hold of the negro, put his hand on him, or touched him, and he answered, positively, that he did neither. There are three other witnesses who testify on that subject— plaintiff, Elliott, and the negro. The two first named say that defendant seized the negro by the arm and told him to come on, or come out, or words to that effect; the negro says that defendant tapped Mm on the shoulder. The story told by plaintiff and his witnesses is the better sustained. Elliott, one of the aldermen, who was the only person, other than plaintiff and the negro, in the room when defendant appeared, tells it as follows:
“He walked back in the back room and walked around like and said, ‘Look here, old negro, what you doing here?’ Q. What was done next; if you know? A. The negro says, ‘They have got me, Cap,’ and Mr. Stovall took the negro by the arm and said, ‘Come on out of here.’ Well, Mi. Terral took the negro by the other arm, and says, ‘You won’t do anything of the kind.’ And .then Mr. Stovall hit Mr. Terral, and then the fight began. He hit him with his fist, sorter under the eye, like.”
[3] The story thus told is corroborated, with immaterial variations, by those of the plaintiff and of Tom Dean, and, all the circumstances of the case considered, we feel bound to accept it as true. And, holding it to be thus established that the defendant began the attack upon plaintiff, we conclude that he went to the scene with the intention of bringing the negro away with him, with or without the consent of the deputy, and that the immediate, or almost immediate, presence of his brother, Lee Stovall, was neither a coincidence nor the result of his hearing the racket while in the neighborhood of Jones’ store, but that he was there agreeably to an understanding to the effect that he would be there. We may add that it is nowhere intimated that the fine imposed upon the negro has ever been paid. The testimony of the witness Jackson, to the effect that the negro paid $5 to the town authorities, and that it was returned to him, and yet that the fine here in question was imposed in order to absorb it, and the questions which developed that testimony, appear to us to be unintelligible, save as an indication of a disposition to attribute improper motives to public officials because of willful ignorance and blind prejudice. The remaining question relates to the claim arising from the prosecution of plaintiff on a charge amounting to that of robbery. The charge was rashly made, with the evident purpose of getting even with plaintiff with respect to the charges, which he had made against defendants, of resisting an officer and assault and battery, and it is sustained by no element of probable cause, nor is the affiant excused by the advice of counsel, since he fails to show that he obtained such advice, upon a full and fair statement of the case. Luther Stovall has, however, been connected with the prosecution by nothing more than a possible inference, or suggestion, which is insufficient to support the claim against him. The question of the damages to be awarded is one of some difficulty. Plaintiff, we think, has suffered no permanent injury, either to his person or character, but has suffered, to some extent, in both respects, and been outraged and humiliated, under circumstances which aggravate his injuries by reason of the fact that they were inflicted upon him while and because he was endeavoring to discharge Ms duty as an officer of the law.
It is therefore ordered that the verdict and judgment appealed from be annulled and set aside, and that there now be judgment in favor of plaintiff and against the defendants, in solido, in the sum of $2,000, with legal interest thereon from the date of this judg *557 ment, and against the defendant Lee Stovall in the further sum of $500, with like interest. It is further ordered that defendants pay all costs.